NEAL HOWARD ROSENBERG (NR7827)
Attorney for Plaintiff
9 Murray Street, Suite 4W
New York, NY 10007
(212) 732-9450

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
A.H. on behalf of J.H.,

     Plaintiff,

  -against-

THE DEPARTMENT OF EDUCATION OF THE
CITY OF NEW YORK,

    Defendant.
-------------------------------------------------------------X

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ DEC 1 9 2008 ★

BROOKLYN OFFICE

08 CIV

**08-5114**

**SIFTON, J**

**GOLD, M.J.**

## COMPLAINT

  Plaintiffs A.H. on behalf of J.H. (hereinafter the "parent"), by their attorney, NEAL HOWARD ROSENBERG, by and through their undersigned counsel, sues the defendant, THE DEPARTMENT OF EDUCATION OF THE CITY OF NEW YORK, and in support thereof, alleges as follows:

### FIRST CLAIM FOR RELIEF-IDEA

### NATURE OF THE PROCEEDING

  1. The proceeding is an appeal pursuant to the Individual with Disabilities Act ("hereinafter "IDEA"), 20 U.S.C. § 1415 (i) (2) (a) from a final decision the New York State Review Officer decision dated August 29, 2008.

  2. Relief is requested because, as is more fully set forth herein, said decision of the New

1

York State Review Officer is in violation of the IDEA, and the laws of the State of New York which require that children with disabilities receive a free and appropriate education The decision of the State Review Officer is attached as Exhibit "A".

3.     The parent filed a request for an impartial due process hearing and an Impartial Hearing Officer was appointed. The hearing was held on May 14, 2008. The corrected decision was rendered on or about June 10, 2008. The issues developed at the hearing were whether the parents were entitled to tuition reimbursement due to the New York City Department of Education violating the procedural and substantive rights of IDEA as specifically set forth below. The Impartial Hearing Officer held that plaintiff was not entitled to tuition reimbursement, holding that the IEP was a free and appropriate education (FAPE) and that the procedural and substantive rights of IDEA were not violated.

4.     Thereafter, the parent timely filed a petition for review at the New York State Office of State Review. On August 29, 2008, the New York State Review Officer ("SRO") improperly and erroneously held that the Department of Education ("DOE") has offered petitioner J.H. a FAPE for the 2007-2008 school year.  The Plaintiff demonstrated both that the Individualized Education Program ("IEP") created was the result of a procedurally invalid Committee on Special Education ("CSE") review and that the subsequent offer of placement at PS 32 failed to address J.H.'s unique and intensive special education needs. Furthermore, J.H. has made tremendous progress at Mary McDowell due to its small classes and school size, extensive one-on-one teacher-student interaction, and the minimal distractions of the school. Lastly, testimony clearly demonstrated that A.H. always cooperated in good faith with the CSE by writing numerous letters requesting information about the CSE's placement, visiting and

2

observing the CSE's recommended program on one of the first days of school, and immediately

advising the CSE of the inappropriateness of the program for J.H. via letter, only to receive no

response from the CSE thereby leaving A.H. with no appropriate placement offer. Accordingly,

under the Carter/Burlington test, tuition reimbursement should have been awarded to J.H.'s

parent for the 2007-08 school year. As a result of the adverse SRO decision dated August 29,

2008, a de novo appeal is herein being filed. (Exhibit "A")

## THE PARTIES

5.      Plaintiff is the parent of J.H, who resides within the City of New York. Kings County

and within the DOE's district and DOE is charged by law with responsibility for the operation,

management and control and responsibility pursuant to IDEA and New York law, for providing a

FAPE to all children who reside within the City of New York including J.H. DOE is within the

jurisdiction of this Court.

## JURISDICTION AND VENUE

6.      This court has jurisdiction over the subject matter of this proceeding pursuant to

IDEA, 20 U.S.C. §1415, (i) (2) (A). In addition, the Court has jurisdiction pursuant to 28 U.S.C.

§ 1331.

7.      Venue lies in this District pursuant to 28 U.S.C. § 1391 (b) (2) as DOE's principal

offices are located in New York County.

## STATEMENT OF FACTS

8.      J.H. is a seven year old student is classified by the DOE as a student with a

Learning Disability in need of special education services.

9.      From a young age, J.H. exhibited expressive language and speech difficulties, fine

3

motor skills issues, and a high level of distractibility.

10.    J.H. attended a collaborative team teaching (CTT) classroom at The Children's
School, a DOE local community school, for Kindergarten during the 2005-06 school year.
J.H.'s Kindergarten class, comprised of two teachers, a paraprofessional, and twenty-four
students, was overwhelming to J.H. and caused him to often "tune out." He made little academic
progress and became socially isolated, so his parent at his teachers' suggestion decided to have
him repeat Kindergarten during the 2006-07 year in the same classroom at The Children's
School.

11.    J.H. made little academic or social progress when he repeated Kindergarten during
the 2006-07 year. Many of his academic, social, and emotional challenges stemmed from his high
level of distractibility, which was most evident during transitions, lunch, and recess. Because of
J.H.'s lack of academic and social progress during his second year of Kindergarten, A.H.
arranged for J.H. to undergo a private neuropsychological evaluation with Dr. Jody Brandt. At
the same time, A.H. opened J.H.'s case with the CSE.

12.    Dr. Brandt had five one-on-one meetings with J.H. in her office and one school
observation. She determined that J.H. had variable concentration, was highly distractible, had
difficulty transitioning from one activity to another, and needed consistent redirection. Dr.
Brandt also observed that J.H. was much more successful when he had one-on-one interaction
and consistent prompting from his classroom teachers. Therefore, Dr. Brandt recommended that
the DOE place J.H. in a supportive academic setting that will provide him with peers of similar
academic profiles and opportunities to experience a sense of comfort, consistency, and success.
A.H. shared Dr. Brandt's report with J.H.'s classroom teacher and Dr. Scott, the school

4

psychologist at The Children's School.

13.    In March, a CSE meeting was held to discuss J.H.'s needs. Notably, in light of Dr. Brandt's report, A.H. knew at the time of this CSE meeting that J.H. required a special education school, and she did not hide from the CSE the fact that she was considering Mary McDowell as a potential placement for J.H.   At the meeting, the CSE agreed that the CTT environment of The Children's School was not appropriate for J.H. and offered A.H. a 12:1 or 12:1:1 program in a local community school, despite Dr. Brandt's recommendation for a small special education setting and small school environment.

14.    J.H.'s special education teacher did not attend his IEP meeting. At the initial CSE meeting, the CSE recommended a 12:1 classroom. However, after the first CSE meeting, the DOE prepared an amended IEP that recommended a 12:1:1 classroom. The CSE did not convene an actual meeting to discuss this change, and the CSE members signed the attendance page individually when it was passed around, as opposed to discussing the recommendations in a group meeting.

15.    Over the summer, A.H. received a letter from the DOE placing J.H. at PS 32. A.H. did not immediately visit PS 32 after receiving this letter, since she believed it was closed during the summer, but did research the school online and wrote the regional CSE two letters requesting a class profile and information about the school. The CSE never responded to A.H.'s letters.

16.    Since she had not been able to observe PS 32 while classes were in session and had not received a response to her letters, A.H. started J.H. in Mary McDowell in September 2007 pending her visit to PS 32.

17.    On September 7, 2007, A.H. visited PS 32 and told Angela Bowie, the parent-teacher coordinator that J.H. had an IEP with a mandate for a 12:1:1 classroom with a modified curriculum.   When A.H. asked Ms. Bowie for information about the program, Ms. Bowie refused to give A.H. a class profile of J.H.'s assigned class. Ms. Bowie showed A.H. the specific class in which J.H. would be placed and repeatedly told A.H. that this class was a CTT classroom with a standard curriculum, contrary to J.H.'s IEP mandates.

18.    PS 32 was inappropriate for J.H. because the class was a CTT environment with a standardized curriculum, while the school itself was too large in size and in number of children, required too many transitions, with lunch and recess identical in size to the Children's School. A.H. advised the regional CSE in writing of these concerns on September 17, 2007 and did not receive a response from the CSE..

19.    In January, after she learned that PS 32 actually did offer 12:1:1 classrooms as a result of the impartial hearing process, A.H. returned to observe the school a second time. This time, A.H. was shown PS 32's 12:1:1 classroom and told that the class followed a modified curriculum. However, A.H.'s concerns about the size of the school, number of transitions, and distractions throughout the day remained.   PS 32 was still inappropriate for J.H., and J.H. completed his year in Mary McDowell.

## THE DOE FAILED TO OFFER J.H.  A FAPE

### A.    The DOE Failed to Comply with the Procedural Requirements of the IDEA and New York State Law.

20.    CSE's procedural violations created a loss of educational opportunity for J.H., thereby denying J.H. FAPE. The CSE failed to include J.H.'s special education teacher on the CSE team, did

6

not utilize sufficient evaluative data at the CSE review, and neglected to adequately discuss with A.H. the appropriateness of its recommendations.

21.     J.H.'s special education teacher did not attend the March 30, 2007 CSE meeting, thereby denying J.H. a FAPE. The special education teacher who is a member of the CSE team should be the person who is or will be responsible for implementing the IEP. The special education teacher, who participated in the review, was not J.H.'s special education teacher during the 2006-07 school year and was in no way scheduled to be J.H's special education teacher for the 2007-08 school year.

22.     The CSE relied upon outdated evaluations and ignored more relevant evaluations when it created J.H.'s IEP. Also, since J.H.'s special education teacher was not present at the CSE meeting, as described above, even this oral information was incomplete and thereby inappropriate.

23.     Furthermore, the DOE ignored the highly relevant evaluation of J.H. from Dr. Jody Brandt, the private psychologist who evaluated J.H. at length and more recently than the documents relied upon by the CSE.

24.     In December 2006, Dr. Brandt conducted five one-on-one evaluations of J.H. in her office, made one school observation at the Children's School, and wrote a detailed report on J.H.'s academic, social, and emotional needs dated January 5, 2007.  On March 22, 2007, Dr. Brandt faxed a summary letter of J.H.'s needs to the CSE in order to reinforce her recommendations of a small school environment in anticipation of the CSE meeting. No members of the CSE Team contacted Dr. Brandt to discuss her recommendations and they took it and put it in the file" without reading or discussing Dr. Brandt's recommendations at the CSE meeting.  Since the CSE ignored the

relevant evaluative information of Dr. Brandt and did not provide any records of more recent evaluations of J.H.'s individualized needs, the IEP that stems from this review fails to offer FAPE.

25.     The CSE has an obligation to ensure that the goals, objectives, and recommendations created for a student are fully discussed and understood by the parent. However, the CSE's recommendations were not adequately discussed with or presented to A.H. who thereby did not have a full and fair opportunity to participate in the CSE process.

26.     The CSE Committee did not adequately discuss or consider alternate class sizes and settings, and thus, the CSE committed a serious procedural violation.

27.     Furthermore, based upon Dr. Brandt's recommendations and A.H.'s concerns, the CSE team should have considered a nonpublic school (NPS) setting. The CSE told her it would not even consider recommending an NPS. The CSE team did not give appropriate consideration to the totality of J.H.'s needs and the type of program he required by failing to consider an NPS. Therefore, by not presenting A.H. with the possibility of a smaller class size or NPS setting, the DOE committed substantial procedural errors, that denied a FAPE to J.H.

28.     New York law requires that "the IEP shall list measurable annual goals, including academic and functional goals, consistent with the student's needs and abilities." In this case, the IEP did not list goals consistent with the J.H.'s needs because the goals were created before the CSE determined what J.H.'s needs actually were and in what setting they would be appropriately addressed. Although the CSE recommended an IEP for J.H. at the March 30, 2007 meeting, it changed J.H.'s mandate from a 12:1 to a 12:1:1 program on April 13, 2007, without updating any of J.H.'s goals and objectives. The goals and objectives at the April CSE meeting were identical to the goals and objectives prepared at the March CSE meeting, despite the CSE's altering of J.H.'s

8

mandate, which would therefore place him in a different learning environment with different support programs. Because the second IEP changed J.H.'s mandate, New York and federal law required the DOE to reconvene the CSE team to discuss other changes in the goals and objectives for J.H. Therefore, the DOE violated NY and federal law by changing J.H.'s mandate without reconvening the CSE.

29.      The significant weight of the procedural errors of the CSE meeting clearly resulted in the loss of J.H.'s educational opportunity. Therefore, this IEP should have been dismissed as the result of an invalid CSE review that denied J.H. FAPE.

**B.      The DOE failed to comply with the substantive requirements of the IDEA.**

30.      The IEP goals were created without the input of J.H.'s special education teacher, and the goals were not calibrated to match J.H.'s special education needs.

31.      The IEP contains no math goals, even though the CSE's evaluations showed that he was still on a Kindergarten level in math after his second year in Kindergarten.

32.      Furthermore, many of the annual goals and objectives in the IEP are inappropriately at the Kindergarten level, despite the fact that J.H. has already completed Kindergarten twice. (T.27) Specifically, J.H.'s phonemic awareness skills, reading skills, recognition of word patterns, memory of details of his writing pieces from day to day are all at the Kindergarten level in the IEP, so keeping his goals at this level would not lead to J.H. performing at a First Grade level, even if he is promoted. Instead, the goals should be modified First Grade goals in order to best foster J.H.'s academic growth.

9

33.     The IEP does not contain a functional behavioral analysis ("FBA") and contains no evidence that an FBA was ever created. The DOE must conduct an FBA when students engage in behavior that impedes learning such as J.H. Without the FBA, the behavior intervention plan ("BIP") included in J.H.'s IEP is premature and incomplete, as a BIP can only be followed by a completed FBA.

34.     In placing J.H. at PS 32, a school that lacks the one-on-one teacher contact, the transitions that J.H. would have to make would only increase his distractions, to the detriment of his academic development. Unstructured times, including lunch and recess are among the most difficult times in the school day for J.H. and among the times when he needs the smallest groups and the most special education supervision and support. However, at PS 32, these would be the times when J.H. would be in his largest groups with the least amount of special education support. J.H. was unable to handle the loud volume and overstimulation of a 75 student lunchroom at The Children's School, and would "shut down" and need constant prompting on how to function. Therefore, since J.H.'s was unable to handle a 75 student sized lunchroom at The Children's School, the DOE should have concluded that placing him in a nearly identical lunch experience, again without a special education teacher to assist him, would be a wholly inappropriate environment and leave him in great discomfort.   Likewise, recess at PS 32 would also be held in the same large group setting of 75 students as lunch without any specific special education support. In short, PS 32 school was too large to meet J.H. unique educational needs.

35.     Ms. Bowie told A.H. erroneous information about the class J.H. would be placed in and refused to give A.H. a class profile of J.H.'s class at PS 32. Although the classroom that Ms. Bowie showed A.H. was smaller than J.H.'s previous classroom at The Children's School, Ms.

10

Bowie erroneously and repeatedly told A.H. that J.H.'s class was a CTT classroom with a standardized curriculum, contrary to J.H.'s IEP mandate of a 12:1:1 classroom with a modified curriculum and identical to the academic environment that had caused J.H. so many social, emotional, and academic problems. Via letter, A.H. communicated to the regional CSE that she was unhappy with the CSE placement, only to again receive no response.

## THE STATE REVIEW OFFICER'S FINDING OF FACT AND DECISION WERE IMPROPER AND ERRONEOUS.

36.     On August 29, 2008, the SRO inappropriately and erroneously rendered a decision adverse to J.H.'s parent. The SRO held that the DOE should not reimburse J.H.'s parent because the placement offered by the district in PS 32 was FAPE.[1]

37.     First, the SRO erred when he ignored the many procedural deficiencies of the IEP discussed above. These deficiencies include issues earlier discussed, such as: J.H.'s special education teacher was not present at the CSE meeting, the CSE did not utilize sufficient evaluative data, the CSE presented its recommendations to A.H. of a 12:1 or 12:1:1 class in a public school as the only possible plans for J.H., and the CSE changed J.H.'s mandate in the IEP without reconvening the CSE team. Although the SRO concedes the procedural violation was not the special education teacher from the previous program or from the proposed program, he held that the procedural violation was not substantial.    The SRO erroneously held that the CSE did not improperly fail to discuss placement options, and did not arbitrarily change the program recommendation to 12:1+1 program. The SRO also held that there was enough evaluative data regarding the student in order to develop

---

[1] The record clearly establishes that Mary McDowell was an appropriate placement and that equitable considerations dictated an award of tuition reimbursement. Although the initial IHO decision held that Mary McDowell was appropriate, the SRO omitted any reference to those issues, and decided the complaint solely on the FAPE issue.  Thus,  the extensive supporting record concerning the appropriateness of the placement at Mary McDowell was not set forth in the complaint.

the IEP.

38.     Second, although implicit, the SRO erroneously and improperly placed the burden of proof that the IEP was substantively invalid on the parent rather than the DOE. The DOE bears the burden of demonstrating the appropriateness of the program recommended by its CSE.

39.     Moreover, in his decision, the SRO failed to acknowledge the substantive inappropriateness of a 12:1:1 class and large school environment at PS 32. Most significantly, the SRO inappropriately ignored the totality of the testimony, which demonstrated the detrimental impact that a large school, multiple transitions, a distracting environment, larger class sizes, less teacher supervision during lunch and recess, and less one-on-one interaction with teachers would have on J.H. By ignoring these factors, the SRO also erroneously disregarded psychological evaluations and observations conducted by Dr. Scott and Dr. Brandt about J.H.'s highly distractible nature, and testimony from Mary McDowell representatives about J.H.'s demonstrated lack of focus in class and difficulty interacting in settings with many distractions.

40.     In addition, the SRO erroneously held that the goals were appropriate when there were no math goals and when J.H's reading goals were kept (for a third year) at a kindergarten reading level. The SRO also erroneously held that FBA was not necessary prior to drafting a BIP.

41.     As a result of the foregoing conduct by the DOE, DOE has violated IDEA 20 U.S.C. § 1400 et. seq. and the regulations promulgated pursuant to IDEA and the SRO should have found that FAPE was not offered to J.H.

WHEREFORE, it is respectfully requested for the aforementioned reasons that a judgment be made and entered reversing the decision of the Office of State Review, declaring for the aforementioned reasons that IDEA has been violated and that the DOE be ordered to reimburse the

12

parents for tuition paid and for related costs and attorney fees and costs and disbursement and any

other relief that is just and equitable.

Dated: New York, New York
December 15, 2008

Respectfully submitted,

NEAL H. ROSENBERG (NR7827)
Attorney for Plaintiff
9 Murray Street, Suite 4W
New York, N.Y. 10007
(212) 732-9450

13

**EXHIBIT "A"**



## The University of the State of New York

### The State Education Department
#### State Review Officer

No. 08-064

**Application of a STUDENT WITH A DISABILITY, by his parent, for review of a determination of a hearing officer relating to the provision of educational services by the New York City Department of Education**

**Appearances:**

Law Offices of Neal Rosenberg, attorneys for petitioner, Neal H. Rosenberg, Esq., of counsel

Michael Best, Special Assistant Corporation Counsel, attorney for respondent, Emily R. Goldman, Esq., of counsel

### DECISION

Petitioner (the parent) appeals from the decision of an impartial hearing officer which denied her request that respondent (the district) reimburse her for her son's tuition costs at the Mary McDowell Learning Center (MMLC) for the 2007-08 school year. The appeal must be dismissed.

At the time of the impartial hearing in May 2008, the student was attending first grade in a special class at MMLC with approximately nine other students (Tr. p. 162). MMLC has not been approved by the Commissioner of Education as a school with which districts may contract to instruct students with disabilities (see 8 NYCRR 200.1[d], 200.7). The student's eligibility for special education services as a student with a speech or language impairment is not in dispute in this appeal (Dist. Ex. 1 at p. 1; see 34 C.F.R. § 300.8[c][11]; 8 NYCRR 200.1[zz][11]).

The evidence in the hearing record indicates that during the 2005-06 and 2006-07 school years, the student attended a district school in a collaborative team teaching (CTT) setting with two teachers, a paraprofessional and approximately 24 students, seven of whom were receiving

Administration of the Woodcock-Johnson Tests of Achievement - Third Edition (WJ-III ACH) yielded standard scores of 117 in oral language and 111 in pre-academic skills (Dist. Ex. 4 at p. 10). The student's performance during academic testing placed him primarily at grade level expectation, with his short-term memory and receptive language skills reported as above grade level expectancy (id. at pp. 6, 10). However, the student's reading was below the kindergarten grade level and the evaluator attributed this to the student's demonstrated delays in phonological processing (id.).

Subtests of the Developmental Neuropsychological Assessment (NEPSY), the Illinois Test of Psycholinguistic Abilities (ITPA), the Test of Auditory Processing Skills-Third Edition (TAPS-3) and the Wide Range Assessment of Memory and Learning - Second Edition (WRAML-2) were administered during the neuropsychological evaluation to further assess the student's verbal skills, visually-based reasoning, motor functioning, executive functioning and attention, and short term memory (Dist. Ex. 4 at pp. 9-10). According to the evaluator, the student's visual logic and analysis and his synthesis of abstract visual stimuli and short term memory were in the average range (id. at pp. 5-6). The student's abstract visual perception, reasoning and categorical reasoning abilities, visual rote learning, fine motor functioning, and attention were areas of weakness that fell in the below average range or below the level of expectation for his age (id.). His visual processing skills were an area of relative strength (id. at p. 5). The student's teachers provided responses to a test identified in the hearing record as the "Connors," indicating that he fell within the clinical range for cognitive problems and inattention, and needed consistent redirection and support to remain on task; however, the student's behavior was not disruptive to his class (id. at pp. 5-6).

The evaluator concluded that the student's overall cognitive performance was in the average range (Dist. Ex. 4 at p. 7). The evaluator summarized the student's areas of strength and weaknesses, noting the student's cooperation during testing and relatively low distractibility in the 1:1 testing environment (id.). Academically, the evaluator indicated that the only skill that fell below the kindergarten grade level was the student's reading, due to his demonstrated delays in phonological processing (id.). The evaluator recommended that the student be placed in a small, highly-structured classroom setting where his progress could be closely monitored and he would receive individualized attention (id. at p. 8). According to the evaluator, the parent's decision to provide tutoring in reading was supported by the findings in the evaluation (id.). The evaluator also recommended that the student receive occupational therapy (OT) and speech-language therapy (id.).

On March 22, 2007, a district social worker conducted a classroom observation of the student (Dist. Ex. 3). While engaged in "choice time," the student played alone with Legos and did not verbally interact with the other students, although the social worker noted that some of the other students were interacting nearby while engaged in similar play activities (id.). At the conclusion of the activity, the student put the Legos away and returned to wait for instructions (id.).

In an undated letter to the district's Committee on Special Education (CSE), the evaluator who conducted the neuropsychological evaluation indicated that the student also required a "nurturing school environment in which undue distractibility, noisy hallways, frequent

3

recommended school and was informed that the only class available for the student was a CTT class that did not follow a modified curriculum (id.). The parent indicated that the CTT class was an inappropriate placement for the student and that the student would attend MMLC for the 2007-08 school year (id.).

In a due process complaint notice dated October 16, 2007, the parent asserted that the April 2007 IEP "was both procedurally and substantively invalid" (Answer Ex. 1).[5] The parent alleged that the district failed to respond to the parent's requests for information made during summer 2007 and that after the recommended school opened, the parent was advised that the school did not have the self-contained 12:1+1 placement as recommended on the student's April 2007 IEP (id.). As relief, the parent sought reimbursement for the costs of the student's tuition at MMLC for the 2007-08 school year (id.).

An impartial hearing was conducted on May 14, 2008.[6] In a decision dated May 29, 2008, the impartial hearing officer noted that there appeared to have been miscommunications between the district and the parent regarding the nature of the classroom that the parent observed in September 2007, but that the testimony of the parent and the teacher of the recommended classroom were consistent with the 12:1+1 special class recommended in the student's April 2007 IEP, and that the district's "mis-description" of the program did not render the placement inappropriate for the student (IHO Decision at p. 3).[7] The impartial hearing officer determined that the hearing record did not demonstrate that the placement offered by the district was inappropriate, and therefore he denied the parent's request for tuition reimbursement (id. at p. 4).

The parent appeals, contending that the impartial hearing officer ignored the procedural deficiencies raised by the parent and improperly placed the burden of proof that the student's IEP

---

[5] I note that the parent's due process complaint notice was not made part of the hearing record, but was attached as additional evidence to the district's answer (Answer Ex. 1). I remind the parties and the impartial hearing officer to include the due process complaint notice as part of the hearing record.

[6] I note that the hearing record contains no explanation whatsoever for the delay in conducting the impartial hearing. While the parent's due process complaint notice is dated October 16, 2007, it appears that the impartial hearing officer did not convene the impartial hearing for nearly seven months, noting only that it had been "calendared for a long time" (Tr. p. 4). I caution the impartial hearing officer to comply with State regulations with regard to granting extensions and rendering a timely, final decision (8 NYCRR 200.5[j][3][xiii], [5]).

[7] While the impartial hearing officer's decision is reasoned and sustainable, it is devoid of any specific cites to transcript pages, exhibit numbers, any statutory or regulatory law, and contains only one passing reference to case law to support his conclusions. State regulations provide in relevant part that "[t]he decision of the impartial hearing officer shall set forth the reasons and the factual basis for the determination. The decision shall reference the hearing record to support the findings of fact" (8 NYCRR 200.5[j][5][v]). In order to properly reference the hearing record, pages of transcript and relevant exhibit numbers should be cited with specificity. State regulations further require that an impartial hearing officer "render and write decisions in accordance with appropriate standard legal practice" (8 NYCRR 200.1[x][4][v]). Citations to applicable law are the norm in "appropriate standard legal practice," and should be included in any impartial hearing officer decision. I note also that the failure to cite with specificity facts in the hearing record and law on which the decision is based is not helpful to the parties in understanding the decision and deciding if a basis exists to appeal. The impartial hearing officer is reminded to comply with State regulations, cite to relevant facts in the hearing record with specificity and provide a reasoned analysis of those facts that reference applicable law in support of his conclusions.

emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living (20 U.S.C. § 1400[d][1][A]; see Schaffer v. Weast, 546 U.S. 49, 51 [2005]; Bd. of Educ. v. Rowley, 458 U.S. 176, 179-81, 200-01 [1982]; Frank G. v. Bd. of Educ., 459 F.3d 356, 371 [2d Cir. 2006]).

A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Rowley, 458 U.S. at 206-07; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). While school districts are required to comply with all IDEA procedures, not all procedural errors render an IEP legally inadequate under the IDEA (Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]; Perricelli v. Carmel Cent. Sch. Dist., 2007 WL 465211, at *10 [S.D.N.Y. Feb. 9, 2007]; O'Toole v. Olathe Dist. Sch. Unified Sch. Dist. No. 233, 144 F.3d 692, 701 [10th Cir. 1998]). Under the IDEA, if a procedural violation is alleged, an administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 C.F.R. § 300.513[a][2]; Matrejek v. Brewster Cent. Sch. Dist., 471 F. Supp. 2d 415, 419 [S.D.N.Y. 2007] aff'd, 2008 WL 3852180 [2d Cir. Aug. 19, 2008]).

The IDEA directs that, in general, an impartial hearing officer's decision must be made on substantive grounds based on a determination of whether the student received a FAPE (20 U.S.C. § 1415[f][3][E][i]). A school district offers a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction" (Rowley, 458 U.S. at 203). However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP" (Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 130 [2d Cir. 1998]; see Rowley, 458 U.S. at 189). The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (Walczak, 142 F.3d at 132, quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted]; see Grim, 346 F.3d at 379). Additionally, school districts are not required to "maximize" the potential of students with disabilities (Rowley, 458 U.S. at 189, 199; Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132). Nonetheless, a school district must provide "an IEP that is 'likely to produce progress, not regression,' and . . . affords the student with an opportunity greater than mere 'trivial advancement'" (Cerra, 427 F.3d at 195, quoting Walczak, 142 F.3d at 130 [citations omitted]; see Perricelli, 2007 WL 465211, at *15). The IEP must be "reasonably calculated to provide some 'meaningful' benefit" (Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]; see Rowley, 458 U.S. at 192). A student's educational program must also be provided in the LRE (20 U.S.C. § 1412[a][5][A]; 34 C.F.R. §§ 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.6[a][1]; see Walczak, 142 F.3d at 132).

An appropriate educational program begins with an IEP that accurately reflects the results of evaluations to identify the student's needs, establishes annual goals related to those needs, and provides for the use of appropriate special education services (Application of the Dep't of Educ., Appeal No. 07-018; Application of a Child with a Disability, Appeal No. 06-059; Application of

The Second Circuit has set forth the standard for determining whether parents have carried their burden of demonstrating the appropriateness of their unilateral placement.

> No one factor is necessarily dispositive in determining whether parents' unilateral placement is reasonably calculated to enable the child to receive educational benefits. Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit, but courts assessing the propriety of a unilateral placement consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs. To qualify for reimbursement under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential. They need only demonstrate that the placement provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction

(Gagliardo, 489 F.3d at 112; see Frank G., 459 F.3d at 364-65; see also A.D. and H.D. v. New York City Dep't of Educ., 06 Civ. 8306 [S.D.N.Y. April 21, 2008]).

Under the IDEA, the burden of persuasion in an administrative hearing challenging an IEP is on the party seeking relief (see Schaffer, 546 U.S. at 59-62 [finding it improper under the IDEA to assume that every IEP is invalid until the school district demonstrates that it is not]). In 2007, the New York State Legislature amended the Education Law to place the burden of production and persuasion upon the school district during an impartial hearing, except that a parent seeking tuition reimbursement for a unilateral placement has the burden of production and persuasion regarding the appropriateness of such placement (Educ. Law § 4404[1][c], as amended by Ch. 583 of the Laws of 2007). The amended statute took effect for impartial hearings commenced on or after October 14, 2007 (see Application of the Bd. of Educ., Appeal No. 08-016).

Turning first to the parent's claim that the impartial hearing officer's decision inappropriately failed to address alleged procedural violations, including the composition of the March 2007 CSE, the failure of the CSE to adequately discuss placement options with the parent, and the inadequate evaluation of the student, I find that these issues were raised during the impartial hearing and the school district did not object to the raising of these issues either at the impartial hearing or on appeal, therefore, I will address them on appeal. First, I will determine whether the district committed any procedural violations and then whether any of the alleged procedural violations impeded the student's right to a FAPE, significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 C.F.R. § 300.513[a][2]; Matrejek, 471 F. Supp. 2d at 419).

With regard to parent's argument that the March 2007 CSE was improperly composed due to the lack of a special education teacher, the hearing record reflects that a certified special education teacher attended both the March and April 2007 CSE meetings, although I note that

9

knowledge regarding the special education program options for the student (Tr. p. 17). The parties' collaborative efforts at the CSE meetings resulted in significant modification of the student's special education program to provide him additional structure and individualized attention. There is insufficient information in the hearing record to conclude that the failure to include a special education teacher at the CSE meetings impeded the student's right to a FAPE, significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or deprived the student of educational benefits (Dist. Exs. 1 at pp. 1-8, 18-19; 6; see 20 U.S.C. § 1415[f][3][E][ii]; 34 C.F.R. § 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]). Accordingly I find that the procedural violation did not substantively result in denying the student a FAPE.

With regard to the parent's contentions that the student's April 2007 IEP did not contain math goals and that his reading goals were inappropriately kept "at the kindergarten level," the student's April 2007 IEP notes that he met all of his previous IEP goals in math for the school year (Dist. Ex. 1 at p. 5). The neuropsychological report noted that the student's counting skills were on target, and although the student did not complete certain subtests during the evaluation due to an inability to perform calculations, the evaluator testified that he could form numerals (Tr. pp. 117-18; Dist. Ex. 4 at p. 6). The evaluator did not describe any math related needs in her evaluation report, instead indicating that the student's only area of academic need was reading, due to his phonological processing delays (Tr. pp. 117-18; Dist. Ex. 4 at p. 7). This conclusion was consistent with the reports of the student's teachers, who indicated that his math skills were better than his ELA skills (Dist. Exs. 2 at p. 1; 5). Based on this evidence in the hearing record, I find that the CSE, at the time it met in March and April 2007, did not commit an error which rose to the level of a denial of a FAPE by not formulating specific goals for the academic area of math.

The four reading goals contained in the April 2007 IEP indicated that the student would achieve the goals "at a kindergarten level" (Dist. Ex. 1 at pp. 11-12). The district psychologist testified that student still "needed a lot of support" and was just beginning to recognize letters and sounds (Tr. p. 32). The evaluator who conducted the neuropsychological testing of the student reported weaknesses in the student's expressive language skills, knowledge of semantics, understanding of spoken analogies, and delayed reading skills, and she noted that his grasp of phonological processing was just emerging (Dist. Ex. 4 at pp. 4-5). In particular she noted that the student's reading skills still remained below the kindergarten level (id. at p. 6). In light of this evidence, I am not persuaded that the student's reading goals were inappropriate, given the undisputed reports of his delays in this area.

With respect to the parent's claim that the behavior intervention plan was deficient because it was not supported by an FBA, the behavior intervention plan noted that the student was "unable to sustain attention during reading, writing, small group [and] large group times" (Dist. Ex. 1 at p. 20). The plan stated that the expected changes in behavior were that the student should be able to remain on task in five-minute increments, and that these increments would increase as his attention to task increased (id.). A positive behavioral intervention strategy in the form of a sticker system would have been employed, in which the student would have been permitted to choose first at "choice time" if he received three stickers (id.). The student would

11

March and April 2007 CSE considered placement of the student in a special class in a special school, this placement was rejected as too restrictive because the student would not have any interaction with typically-developing peers as role models (Dist. Ex. 1 at p. 18). The district's recommendation that the student attend a 12:1+1 setting for nearly all of the school day is consistent with the evaluator's opinion that the student required a small, highly-structured setting with individualized attention (Dist. Exs. 4 at p. 8; 6). Although the parent and evaluator who preformed the neuropsychological may have optimally preferred that the student be placed in a smaller school setting for the entire school day (Tr. p. 175; Parent Ex. D), the district was required to recommend a placement that was appropriate to confer educational benefits in the LRE to the student (Walczak, 142 F.3d at 132; Tucker, 873 F.2d at 567; see Carlisle Area Sch. v. Scott P., 62 F.3d 520, 535 [3d Cir. 1995]). The evidence in the hearing record does not persuade me that the student is unable to interact with general education peers in a larger setting (see Dist. Exs. 2; 6),[9] but only that instruction in a large setting such as a CTT was not appropriate for him during the 2007-08 school year (Tr. pp. 10-11). Because the hearing record is clear that the student would have spent virtually all of his instructional time in a setting of 12 students with substantial individual attention, I concur with the conclusion reached by the impartial hearing officer and find that the district offered an appropriate placement for the student (Tr. pp. 48, 59, 61-62; IHO Decision at p. 4).

In view of the forgoing, I find that the alleged procedural infirmities did not rise to the level of denying a FAPE to the student. In addition, I find as did the impartial hearing officer, that the April 2007 IEP, at the time it was formulated, was reasonably calculated to provide the student with educational benefits, and that the district appropriately offered the student a placement in a 12:1+1 classroom (see O'Toole, 144 F.3d at 701; J.R. v. Bd. of Educ. of City of Rye Sch. Dist., 345 F. Supp. 2d 386, 395 (S.D.N.Y. 2004); see also Antonaccio v. Bd. of Educ. of Arlington Cent. Sch. Dist., 281 F. Supp. 2d 710, 724 (S.D.N.Y. 2003). Accordingly, the evidence in the hearing record does not persuade me that the district failed to offer the student a FAPE (M.D. and T.D. v. New York City Dep't of Educ., 07 Civ. 7967 [S.D.N.Y. June 27, 2008]). Generally, having determined that the challenged IEP offered the student a FAPE in the LRE for the 2007-08 school year, I need not reach the issue of whether the parent's unilateral placement of her son at MMLC was appropriate, and the necessary inquiry is at an end (Mrs. C. v. Voluntown, 226 F.3d 60, 66 [2d Cir. 2000]; Walczak, 142 F.3d at 134; Application of the Bd. of Educ., Appeal No. 08-029; Application of a Child with a Disability, Appeal No. 07-017; Application of a Child with a Disability, Appeal No. 03-058).

I have considered the parent's remaining contentions and find that they are without merit.

**THE APPEAL IS DISMISSED.**

Dated:     Albany, New York
           August      , 2008

PAUL F. KELLY
STATE REVIEW OFFICER

---

[9] Although the parent testified that at one point she observed the student during recess isolated and kicking rocks (Tr. p. 94), the student's CTT teachers reported that the student was very social in the classroom and that at times his socialization interfered with his academic work (Dist. Ex. 2 at p. 1).