UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X

A.H., on behalf of J.H., an infant,

                Plaintiff,        08-CV-5114 (CPS)(ALC)

   - against -              MEMORANDUM
                                      OPINION
New York City Department of      AND ORDER
Education,

                Defendant.

----------------------------------X
SIFTON, Senior Judge.


    Plaintiff A.H., on behalf of J.H.,[1] commenced this action

against the New York City Department of Education ("DOE") on

December 19, 2008, seeking review of the decision by the State

Review Officer ("SRO") dated August 29, 2008, which affirmed a

finding that the DOE complied with the Individuals with

Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401(9), when it

offered J.H. a public school placement for the 2007-2008 school

year and denied plaintiff's request for reimbursement for tuition

she paid to privately educate J.H. during that year. Plaintiff

seeks a judgement reversing the SRO decision, a declaratory

judgment that defendant violated the IDEA, reimbursement for

tuition paid, attorneys' fees, and costs. Now before the court

are cross motions for summary judgment by the parties. For the

reasons stated below, the motion by defendant is granted in part

---

[1]A.H. and J.H. are proceeding under fictitious names because J.H. is an
infant.

and denied in part, and the motion by plaintiff is granted in part and denied in part.

## BACKGROUND

The following facts are taken from plaintiff's complaint and the record of the proceedings below. Disputes are noted.

J.H. is a nine year old child who has been classified by the DOE as a student with a learning disability in need of special education services due to his speech and language impairments. D. Ex. 1.[2] Plaintiff is the mother of J.H. When J.H. was in kindergarten, plaintiff grew concerned about his lack of academic and social progress, and decided in consultation with school officials that he should repeat kindergarten. When J.H.'s performance did not improve in his second year of kindergarten, plaintiff had him privately evaluated by Dr. Jody Brandt, who concluded that J.H. was highly distractable and could not function in large group settings. DOE convened a CSE team to evaluate J.H., which determined that he would be best served by a special needs classroom at a public school. Plaintiff in the meantime researched schools and decided that the Mary McDowell Center for Learning, a private school focusing on special needs children, was the best option for J.H., and enrolled him there

---

[2]Both parties refer to the exhibits submitted to the State Review Officer. Defendant's exhibits are listed as numbers 1-6, and plaintiff's exhibits are listed as letters A-F.

for the 2007-2008 school year, for which she paid full tuition.
Plaintiff subsequently rejected the public school option as
inappropriate, and now seeks reimbursement for the private school
tuition. At oral argument on these motions, both plaintiff and
defendant stated that they had no knowledge regarding J.H.'s
educational placement for the 2008-2009 school year or the
upcoming 2009-2010 school year.

In order to place the factual record of this case in
context, I first review the requirements of IDEA and the means by
which it may be challenged, after which I describe J.H.'s school
history and evaluations in more detail.

## A.    Individuals with Disabilities Education Act

Congress enacted the IDEA "to ensure that all children with
disabilities have available to them a free appropriate public
education that emphasizes special education and related services
designed to meet their unique needs... [and] to ensure that the
rights of children with disabilities and parents of such children
are protected." 20 U.S.C. § 1400(d)(1)(A) & (B).[3] In order to
achieve this goal of a free appropriate public education ("FAPE")

---

[3] A "free appropriate public education" ("FAPE") is defined as special
education and related services that: (1) are provided under public supervision
and at public expense without cost to parents; (2) meet the standards of the
state educational agency; (3) include an appropriate preschool, elementary, or
secondary school education; and (4) are provided in conformity with the
individualized education program required by § 1414(a)(5) of the Act. See 20
U.S.C. § 1401(a)(18).

for all children with disabilities, the IDEA requires that the States comply with extensive procedural requirements and safeguards in order to receive federal funds for use in special education programs. See 20 U.S.C. § 1415. A free appropriate public education must include "special education and related services" tailored to meet the unique needs of a particular child, 20 U.S.C. § 1401(a)(18), and be "reasonably calculated to enable the child to receive educational benefits." *Board of Education v. Rowley*, 458 U.S. 176, 207, 73 L. Ed. 2d 690, 102 S. Ct. 3034 (1982).

The IDEA views private school as a last resort. *W.S. v. Rye City Sch. Dist.*, 454 F.Supp.2d 134, 148 (S.D.N.Y. 2006). "To the maximum extent appropriate" children with disabilities must be educated with children who are not disabled, in the "least restrictive environment." 20 U.S.C. § 1412(a)(5). A child may only be removed into a more restrictive environment when the nature and severity of her disability is such that education in regular classes with the use of supplementary aids and services cannot be satisfactorily achieved. *Id.*; 34 C.F.R. 300.114(a)(2); *Briggs v. Bd. of Educ.*, 882 F. 2d 688 (2d Cir. 1989). "This is true even if a child with disabilities might make greater academic progress in a more restrictive environment. The CSE must consider the unique benefits, academic and otherwise, that a student receives by remaining with non-disabled peers." *W.S.*, 454

F.Supp.2d at 148.

In accordance with this regulatory framework, "[t]he centerpiece of the IDEA's education delivery system is the individualized education program, or IEP." *Murphy v. Arlington Cent. Sch. Dist. Board of Educ.*, 297 F.3d 195, 197 (2d Cir. 2002) (internal quotations omitted). "The IEP, the result of collaborations between parents, educators, and representatives of the school district," is created annually, and "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Id.* 20 U.S.C. § 1414(d)(1).[4] New York State has assigned responsibility for developing appropriate IEPs to local Committees on Special Education ("CSEs"), the members of which are appointed by school boards or the trustees of school districts. N.Y. Educ. Law. § 4402(1)(b)(1).

Parents who are dissatisfied with a proposed IEP may request

---

[4] In full, an IEP must state (1) the child's present levels of academic achievement and functional performance; (2) the annual goals for the child; (3) how the child's progress towards the annual goals will be measured; (4) what services and aids will be provided to the child and the extent to which the child will be able to participate in regular educational programs; (5) the extent to which the child will participate with non-disabled children in class; (6) what accommodations are necessary, including alternative assessments; (7) the projected initiation date and duration for the proposed services. 20 U.S.C. § 1414(d)(1). The IEP is developed by team that includes, at minimum, the parents, a general education teacher, a special education teacher, and a representative of the local education agency. 20 U.S.C. § 1414(d)(1)(B).

an impartial due process hearing before an Independent Hearing Officer ("hearing officer"). 20 U.S.C. § 1415(f)(1)(A); N.Y. Educ Law § 4404(1)(a). The hearing officer's decision may be appealed to the State Review Officer ("SRO"), who independently reviews the findings, after which any party may sue in either state or federal court. 20 U.S.C. §§ 1415(g), 1415(i)(1)(B). Parents who disagree with an IEP may also unilaterally enroll a child in a private school of their choice, without the consent of state or local officials, and request retroactive reimbursement. However, they do so "at their own financial risk," as reimbursement may be denied if it is later determined that the IEP was appropriate for the child. *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 15, 114 S. Ct. 361, 126 L. Ed. 2d 284 (1993).

**B. Facts**

The following sections detail J.H.'s academic and functional limitations, DOE's assessment, and J.H.'s performance at the Mary McDowell school.

*1. Kindergarten*

For the 2005-06 school year, J.H. attended kindergarten at a collaborative team teaching ("CTT") classroom at The Children's School, a DOE local community school. Transcript Before the DOE Impartial Hearing Officer at 90 ("Tr."). The class consisted of

two teachers, a paraprofessional, and twenty-four students. D. Ex. 3. J.H. made little progress during the year, and was unable to interact with other children in the classroom and at recess. Tr. 90-91. Based on his lack of progress and his immaturity, the school suggested, and his parents agreed, that he repeat kindergarten during the 2006-07 school year in the same classroom. Tr. 91. In his second year of kindergarten, J.H. continued to make little academic or social progress. Tr. 92. He would easily lose focus in class and become "glazed over." Tr. 95-96. Although J.H. had play dates with schoolmates, during lunch and recess he would not sit with anyone. Tr. 93. His mother testified that at recess, he would walk around "kicking rocks by himself and not really interacting." Tr. 94. If the classroom was full in the morning when he entered he would "look around, kind of glazed over as if he didn't know what to do." *Id*. He required instructions on simple tasks like putting away his backpack when he entered the classroom. *Id*. Concerned, J.H.'s parents contacted his teachers in November, 2006, and stated that the program did not seem to be appropriate for J.H. Tr. 95. They arranged for J.H. to undergo a private neuropsychological evaluation with Dr. Jody Brandt and sought to review J.H.'s case with the Committee of Special Education ("CSE"). Tr. 96.

In November 2006, the DOE's Student Based Support Team at the Children's School conducted a Social History Update of J.H.

at plaintiff's request. D. Exs. 2, 5. The report noted that J.H. needed remediation in all areas, required a lot of individual attention, was not reading at grade level, and that his math skills were better than his language skills. D. Ex. 2. The report also noted that J.H. was comfortable interacting with adults in the classroom and that he was very social with other students. *Id.*

On March 22, 2007, J.H. was observed by a social worker from the DOE, who noted in a brief report that J.H. played by himself during group playtime and did not interact with the four other students playing with the same set of toys. D. Ex. 3.

2. *Dr. Brandt's Assessment*

Dr. Brandt had five one-on-one meetings with J.H. in her office and one school observation with him starting in December 2006. Tr. 99. Dr. Brandt determined that J.H. had variable concentration, was anxious, highly distractable, had difficulty transitioning from one activity to another, and needed constant redirection (to which he was responsive). Tr. 100-101. In performing the evaluation tests, J.H. had difficulty organizing his thoughts, moved at a slow pace, and required reminders to keep working. 103-104. Overall, he tested between the 4th and 10th percentile in attention, had an average memory, and was one grade behind academically. Tr. 105. He related well and had a good

sense of humor, but was also immature. Tr. 105-106.

Dr. Brandt visited J.H.'s classroom and observed the class performing a group reading activity and making the transition to independent reading, as well as a library exchange and a peer group activity. Tr. 107. Dr. Brandt observed that J.H. was a "loner in the classroom" who was highly distracted and thus unable to follow what was occurring in the classroom. *Id*. He did not participate in group discussion or follow the dialogue, though he cooperated with group instructions. Brandt Evaluation at 3, D. Ex. 4. During independent reading, J.H. was slow to get started and continually became distracted, although he was able to return to his reading. *Id*. When the children were instructed to bring their library books to the library corner and exchange books, J.H. became lost on the way to the corner and did not know what to do; the teacher walked him through each step of the process. Tr. 108. J.H. became overwhelmed and confused and called his teachers by incorrect names. Tr. 108-109. J.H. was able to interact properly with peers and complete tasks once he was directed by the teacher. *Id*.

Dr. Brandt recommended that J.H. be placed in a small, highly-structured classroom setting that could provide individualized attention. Brandt Evaluation at 8. He would be best served by a calm and consistent school environment without noisy hallways, frequent transitions, or large groups of

children. *Id*. She testified that this recommendation was based on her observations that J.H. required several minutes to settle in to a new environment or task and required constant prompting, redirection, and guidance. Tr. 111-112. She stated that lunch and recess were likely to be particularly overwhelming to a child as distractable as J.H. Tr. 112. She emphasized that J.H. requires not only a special education classroom, but also a special education school setting that would minimize disruptive activities (such as large lunch room settings) outside the classroom. Tr. 114. Dr. Brandt testified that J.H. would not be able to function in a lunch room setting containing 75 students,[5] because he would be come easily lost, worn down, and disorganized. Tr. 115. Dr. Brandt agreed that a 12 to 1 teacher to student ratio would be appropriate for J.H., but stressed that he also required a school environment outside the classroom that minimized disruptions. Tr. 120.

Plaintiff shared Dr. Brandt's report with J.H.'s classroom teacher and Dr. Scott, the school psychologist at the Children's School. Tr. 127.

## 3. *CSE Review and Resulting IEP*

On March 30, 2007 and April 13, 2007, CSE meetings were held

---

[5]The size of the lunch room at the school later recommended by the DOE.

to evaluate J.H.'s status in the school system. Tr. 6-8.[6] The CSE

contained the following members: plaintiff, a district

representative, a general education teacher who was one of J.H.'s

then current teachers, the IEP coordinator at the Children's

School who was certified in special education, and a school

psychologist. D. SMF ¶ 12. The CSE considered the following

information in creating his Individualized Education Program

("IEP"): the March 22, 2007 classroom observation, Dr. Brandt's

evaluation, the social history update, and progress reports

prepared by J.H.'s teachers. Tr. 12. At the meeting, the CSE team

agreed that the CTT environment of the Children's School was not

appropriate for J.H. When plaintiff asked the team what it was

going to recommend, she was told that the group was "not in a

position to recommend" any private schools, and that "the best

that [could be done] was either a 12:1 or a 12:1:1." Tr. 128.[7]

The team created an IEP recommending that J.H. be moved to a

12:1:1 program in a special class in a community school, and that

he be provided speech and language therapy sessions. D. Ex. 1.

The IEP noted that a special class in a specialized school would

be "too restrictive," because J.H. would benefit from having non-

disabled peers as role models. *Id.* at 18. The IEP recommended

---

[6]There is no indication in the record of whether subsequent CSE meetings have been held since 2007 or whether J.H.'s IEP has been modified.

[7]A 12:1 classroom contains twelve students and one teacher. A 12:1:1 program contains an additional paraprofessional who assists the teacher.

that J.H. receive preferential seating and ongoing teacher prompting. *Id.* at 7. Following the CSE, plaintiff did not state any objections to the IEP or the 12:1:1 program. P. Exs. A, B, C. Plaintiff testified that she agreed to the 12:1:1 option because she believed it was her only choice based on what the CSE told her. Tr. 132, 133.

*4. Plaintiff's School Selection*

On March 10, 2007, prior to the CSE team meeting, plaintiff paid a $5,000 non-refundable deposit to Mary McDowell to hold a place for J.H., in the event that she did not approve of the CSE's recommended school plan. Tr. 158. Under the contract, plaintiff had until May 1, 2007 to withdraw J.H.'s enrollment for the upcoming year, after which she was bound to pay the full tuition amount of $38,000. P. Ex. E. Plaintiff did not withdraw J.H.'s enrollment, nor did she inform the CSE that after May 1, she was committed to sending J.H. to a private school. Tr. 157, 159.[8]

By letter dated July 6, 2007, the DOE informed plaintiff that it had recommended a 12:1:1 placement at Public School 32 ("PS 32") for J.H. D. Ex. 6. The letter provided the contact information of a person plaintiff could call with any questions

---

[8]Plaintiff testified that she "mentioned" to the CSE that she was "considering" Mary McDowell.

about the placement. *Id*. By letter dated July 17, 2007, plaintiff

wrote to Larry Parker at the Committee on Special Education[9]

requesting more information about PS 32, stating that because

school was not in session, she could not make a decision about

the program; plaintiff received no response. Pl. Ex. A, Tr. 136-

37. Plaintiff did not visit the school or take other steps to

investigate the placement. Tr. 137. By letter dated August 20,

2007, plaintiff again wrote to Mr. Parker stating that she had

not received the requested information and advising that J.H.

would begin the school year at Mary McDowell. Pl. Ex. B.

Plaintiff visited PS 32 on the first day of school in

September, and met with parent-teacher coordinator Angela Bowie.

Tr. 138. Plaintiff informed Ms. Bowie that she had an IEP with a

12:1:1 mandate. *Id*. According to plaintiff, Ms. Bowie stated that

J.H.'s class was in a collaborative teaching classroom that

followed a standardized teaching curriculum. Tr. 138-40.[10] By

letter dated September 17, 2007, plaintiff wrote to Mr. Parker

that she was rejecting the placement at PS 32 on the ground that

a standardized curriculum was inappropriate for J.H., but

received no response. Tr. 143. In January 2008, plaintiff visited

---

[9]Mr. Parker was not the person plaintiff was directed to contact in the event she had questions about J.H.'s placement. There is no indication of whether the letter was transmitted to the correct recipient.

[10]Plaintiff conceded that the classroom she was shown contained only eight students, which was consistent with a 12:1 classroom rather than a CTT classroom. Tr. 140.

PS 32 again, after being informed that the school did contain a 12:1:1 classroom with a modified curriculum. Tr. 144. Plaintiff toured the school and concluded that it was inappropriate because the school was large, the lunchroom was large, there were several classes outside of the home room that would require transitioning locations, and the number of students at recess was large. Tr. 145-46.

J.H. completed the school year at Mary McDowell with Ms. Crafton as his teacher. Tr. 162.

*5. Features of PS 32 and Mary McDowell*

PS 32 consists of 250 students, thirty percent of whom receive special education. Tr. 49, 50. The school contains a 12:1:1 teaching classroom with a modified curriculum taught by Courtney O'Reilly, a certified special education teacher. Tr. 46. The students in Ms. O'Reilly's class learn through a combination of class lessons, small group instruction, and independent study. Tr. 47-48. Students come into contact with general education students at lunch and recess. Tr. 48. During lunch, there are 75 students eating together at a time, supervised by five staff members. Tr. 60. Ms. O'Reilly testified that J.H. would fit into her class, judging by his levels of functioning, and that she could fulfill the requirements of his IEP. Tr. 54.

Mary McDowell is a private Quaker school for children with

diagnosed learning disabilities or speech and language disorders, which J.H. attended during the 2007-2008 school year. Tr. 78. The school has two buildings; the lower school building in which J.H. attended classes houses a self-contained group of 34 children. Tr. 76. J.H. was in a class of ten students and two teachers, and received speech and language therapy twice a week in a group of two and occupational therapy twice a week in a group of two. Pl. Ex. F. at 2. J.H.'s reading and math groups each contained five students. Tr. 169, 171. Anna Crafton, J.H.'s lead teacher, testified that the small class sizes minimized J.H.'s distractions and ensured that he was properly redirected and refocused on his reading tasks. Tr. 170-71. Over the course of his year at the school, J.H. experienced progress in reading (to a first-grade level), stamina, focus, and math (to a high kindergarten level). Tr. 168-71. The lunch and recess periods have between 14 and 20 students with a minimum of two teachers who assist students in initiating conversation and modeling social behavior and self help skills. Tr. 175-76. J.H. made significant improvements in these areas, including learning proper eating skills. Tr. 177.[11]

**C. Procedural History**

---

[11]Previously, J.H. had eaten food with two utensils, shoveling food into his mouth and dropping most of the food onto himself and the floor. Tr. 177.

By a due process complaint notice dated October 16, 2007, plaintiff requested an impartial hearing, contending that the April 2007 IEP was procedurally and substantively flawed. State Review Officer Decision at 5 ("SRO Decision"). An Impartial Hearing was held on May 14, 2008. *Id*. The hearing officer issued his corrected findings of fact and decision on June 10, 2008, in which he found that the placement offered by the DOE was appropriate and less restrictive than Mary McDowell, because J.H. would have an opportunity to interact with non-disabled peers. Independent Hearing Officer Decision at 4 ("IHO Decision"). The hearing officer noted that there was miscommunication between a teacher at PS 32 and plaintiff regarding what form of teaching was available at the school, but that this did not invalidate the otherwise appropriate placement. *Id*. at 3. He noted that while the private school setting had clearly been successful, the public school placement was substantially similar, and would likely have met J.H.'s needs. *Id*. at 3-4. He deemed that there was no basis for rejecting it without having tried it. *Id*. at 4.

Plaintiff appealed the hearing officer's decision to the SRO, which issued a decision on August 29, 2008. The SRO concluded that DOE had offered J.H. an appropriate placement and that the April 2007 IEP was reasonably calculated to provide J.H. with educational benefits. SRO Decision 13. The SRO determined that the procedural errors asserted by plaintiff were either not

supported by the record or did not rise to the level of denying a free appropriate public education to J.H. *Id*. Accordingly, the SRO denied plaintiff's request for tuition reimbursement. *Id*. Plaintiff appealed the SRO's decision by filing a complaint in this Court on December 14, 2008.


## DISCUSSION

### I.  Jurisdiction and Standard of Review

"The responsibility for determining whether a challenged IEP will provide a child with an appropriate public education rests in the first instance with administrative hearing and review officers. Their rulings are then subject to 'independent' judicial review," *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d cir. 1998), based on a preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C); *see also Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380, 74 Fed. Appx. 137 (2d Cir. 2003). The Second Circuit and the Supreme Court have interpreted the IDEA as "strictly limiting judicial review of state administrative decisions." *Grim*, 346 F.3d at 380-81 (citing *Rowley*, 458 U.S. at 204-08; *Walczak,* 142 F.3d at 129). District courts "may not 'substitute their own notions of sound educational policy for those of the school authorities which they review.'" *A.C.*, 553 F.3d at 171 (quoting *Rowley*, 458 U.S. at 206). "While federal courts do not simply rubber stamp

administrative decisions, they are expected to give 'due weight'
to these proceedings." *Walczak*, 142 F.3d at 129.[12]


## II.  Tuition Reimbursement

Plaintiff argues that the SRO decision must be overturned
and seeks the remedy of reimbursement for tuition costs paid to
privately educate J.H. at a special needs school that she
unilaterally chose. Tuition reimbursement is not the normal means
of obtaining a FAPE; "Congress intended that IDEA's promise of a
'free appropriate public education' for disabled children would
normally be met by an IEP's provision for education in the
regular public schools or in private schools chosen jointly by
school officials and parents." *Florence County Sch. Dist. Four v.
Carter by & Through Carter*, 510 U.S. 7, 12, 114 S. Ct. 361, 126
L. Ed. 2d 284 (1993). "Reimbursement merely requires [a district]
to belatedly pay expenses that it should have paid all along and
would have borne in the first instance" had it offered the
student a FAPE." *Sch. Comm. of Burlington v. Dep't of Educ.*, 471
U.S. 359, 370-71, 105 S. Ct. 1996, 85 L. Ed. 2d 385 (1985).

---

[12]Plaintiff argues that the IDEA and New York State regulations require
that a court conduct a *de novo* review of the SRO's decision, citing 20 U.S.C.
§ 1415(i)(2)(C) (a reviewing court "shall grant such relief as the court
determines is appropriate") and 8 NYCRR § 279.12 (the decision of the State
Review Officer "shall not constitute binding precedent in any judicial action
or proceeding or administrative appeal in any forum whatsoever."). Plaintiff
concludes that an SRO decision may not be given any weight. This is contrary
to the holdings of the Second Circuit in *Walczack* and *A.C.* Although an SRO
decision is not binding, it may be persuasive.

To determine whether parents are entitled to tuition reimbursement, a court must engage in a three-step process: "[f]irst, we examine whether the state has complied with the procedures set forth in the IDEA. Second, we consider whether the proposed IEP is substantively appropriate in that it is reasonably calculated to enable the child to receive educational benefits. Only if the IEP is procedurally or substantively deficient do we reach the third step and ask whether the private schooling obtained by the parents is appropriate to the child's needs." *T.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2007) (internal quotations and citations omitted). In fashioning relief, equitable considerations relating to the reasonableness of the action taken by the parents must be considered. *See Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 363-64 (2d Cir. 2006) (citing *Burlington*, 471 U.S. at 374).

In developing a particular child's IEP, a CSE is required to consider four factors: "(1) academic achievement and learning characteristics; (2) social development; (3) physical development; (4) managerial behavioral needs." *Walczak* 142 F.3d at 123 (citing N.Y. COMP. CODES R. & REGS. tit. 8 § 200.1 (kk)(2)(i)). As set forth more fully below, although the IEP properly took account of J.H.'s need for a small classroom learning environment, it did not consider the extent to which his difficulty with transitions and interacting with peers would be

exacerbated by attending school with 250 students and eating in a lunch room of 75 students. This substantive failure may have stemmed from a procedural failure to provide no special education teacher of J.H. on the CSE team. However, notwithstanding these errors, I conclude that plaintiff is not entitled to reimbursement, because the equities weigh heavily against awarding such a remedy.

**A.  Procedural Compliance**

"The initial procedural inquiry is no mere formality." *Walczak*, 142 F.3d at 129. Rather, "the formality of the Act's procedures is itself a safeguard against arbitrary or erroneous decisionmaking." *Evans v. Bd. of Educ. of the Rhinebeck Cent. Sch. Dist.*, 930 F. Supp. 83, 93 (S.D.N.Y. 1996) (internal quotations omitted). However, not every procedural error will render an IEP "legally inadequate." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 381 (2d Cir. 2003). Relief is warranted for a procedural violation only if the student is denied a FAPE, *J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 69 (2d Cir. 2000), which occurs when the alleged procedural inadequacies "(I) impeded the child's right to a free public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of [a FAPE] to the parents' child; or (III) caused a deprivation of educational

benefits." 20 U.S.C. § 1415f(3)(E)(ii).

Plaintiff alleges that defendant violated the IDEA's procedural requirements on the following grounds, which she also argued before the hearing officer and SRO: (1) J.H.'s special education teacher did not participate in the development of J.H.'s IEP; (2) the CSE used outdated evaluations and did not take account of relevant evidence in its review; (3) plaintiff did not have a full and fair opportunity to participate in the process; (4) and the CSE changed the IEP from a 12:1 to a 12:1:1 mandate without convening a full CSE meeting or updating J.H.'s goals or objectives. Upon review of the record, I find that only the first ground has merit.

*a. Special Education Teacher*

Federal and State regulations require that the membership of each CSE include at least one special education teacher of the child. *See* 34 C.F.R. § 300.321(a)(3), 8 NYCRR § 200.3(a)(1)(iii).[13] A failure to properly compose the CSE in this manner may result in denial of a FAPE. The SRO has found that CSEs were improperly composed when they included a special education teacher who was not a teacher of the child or included a special education teacher for less than the entire meeting. *See*

---

[13]Plaintiff additionally cites a federal regulation that is no longer available in the federal register, 34 C.F.R. § 300.344, and cites another federal regulation that does not contain the cited text, 34 C.F.R. § 300, Appendix A, Notice of Interpretation, Section IV, Question 26.

SRO Appeal No. 05-087, SRO Appeal No. 07-105, SRO Appeal No. 01-044, SRO Appeal 00-031.[14]

The person who attended J.H.'s CSE in the capacity of special education teacher was an IEP coordinator at his prior school and was certified in special education.[15] J.H.'s special education teacher at Mary McDowell testified, but was not part of the CSE team and was not present for the entire meeting and IEP development process. The SRO found that the absence of J.H.'s special education teacher from the CSE team was a violation of the procedural requirements of the IDEA, but that J.H. was not denied a FAPE as a result, because there was no evidence that the person who attended the meeting lacked familiarity with the program proposed for J.H. Arguing that this determination should be upheld, defendant states that the IEP coordinator was familiar with and able to teach in a variety of special education classrooms, and therefore had knowledge of the special education options for J.H. However, the IEP coordinator did not have experience teaching J.H., nor was that person scheduled to implement J.H.'s IEP at his new school. The coordinator was accordingly not positioned to ensure that an IEP was developed that took account of J.H.'s particular difficulties that he

---

[14]The SRO decisions are available at http://www.sro.nysed.gov/decisionindex/default.html (last visited July 21, 2009). The decisions do not have case names.

[15]The person is not named in the record.

encountered inside and outside the classroom. This procedural
failure is significant in light of the IEP's substantive
deficiency, described further below, in that the IEP failed to
include provisions for accommodating J.H.'s difficulties in
making transitions and interacting with large groups of children.

b. *Evaluations Used by CSE*

Plaintiff alleges that the CSE did not consider a sufficient
amount of evaluative data to form an appropriate understanding of
J.H.'s needs, because it relied on evaluations that were over six
months old. Plaintiff further alleges that the CSE ignored Dr.
Brandt's evaluation. A CSE must consider "the present levels of
academic achievement and related developmental needs of the
student." 8 NYCRR § 200.4(5)(ii)(b). A student must be assessed
in all areas related to a suspected disability, and the
evaluation must be sufficiently comprehensive to identify all of
the student's special education needs. 8 NYCRR 200.4(b)(6)(vii)
and (ix). The SRO noted that several evaluations were conducted
and determined that there was no evidence that the CSE relied
upon insufficient data. Plaintiff's claim that all of the
information considered was six months old is incorrect.[16]

---

[16]The CSE considered a January 2007 neuropsychological report by Dr.
Brandt, a classroom observation of J.H. from March 2007, a November 2006
social history update, and a March 2007 progress report by J.H.'s teachers,
speech therapist, and occupational therapist. D. SMF Reply ¶ 22. The progress
reports were reported orally at the meeting rather than in writing.

Furthermore, the record makes clear that the CSE considered it in some depth. *See* Tr. 12, 22; compare D. Ex. 1 at 4 with D. Ex. 4 at 7. Because the CSE considered comprehensive reports of J.H.'s academic achievement and developmental needs, there are no grounds upon which to find procedural fault in this regard.

*c. Plaintiff's Participation*

Parents of a disabled child have a right "to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child." 20 U.S.C. § 1415(b)(1). A denial of a FAPE occurs if a parent's opportunity to participate in the decision-making process is "significantly impeded." 20 U.S.C. § 1415(f)(3)(E)(ii). Plaintiff alleges that the CSE did not adequately discuss its recommendations with her, and therefore she lacked an opportunity to participate in the process. She states that the CSE did not make clear what differences existed between a 12:1 and a 12:1:1 classroom and why such classroom settings would be appropriate,[17] and that the CSE did not discuss with her the option of placing J.H. in a private school in a smaller classroom, instead indicating that her only choices were the 12:1 and 12:1:1 classrooms. Tr. 133. Neither of these

---

[17]The distinction between these two class forms is that the latter contains an extra paraprofessional to help the students.

contentions has merit.

First, the record makes clear that plaintiff understood the role of a paraprofesisonal, which is the only distinction between a 12:1 classroom and a 12:1:1 classroom.[18] Second, the IEP states that a special class in a specialized school was considered and rejected as being too restrictive, because J.H. benefits from having non-disabled peers as role models, and the IDEA mandates that a child be placed in the least restrictive environment. D. Ex. I at 18. Given that the CSE considered it educationally inappropriate to place J.H. in a specialized school, of which Mary McDowell is an example, the lack of discussion regarding this option does not amount to a procedural deficiency. Indeed, after substantial input from plaintiff regarding J.H.'s needs, the CSE modified J.H.'s collaborative team teaching class to a special education class with a much smaller student to teacher ratio and more services than J.H. had previously been receiving. The evidence indicates that plaintiff had an opportunity to participate in the process and that the CSE took account of her suggestions. The record contains no evidence that plaintiff objected to the IEP as developed by the CSE. There is no evidence in the record to support a finding that plaintiff's input in the

---

[18]Plaintiff testified that in J.H.'s old classroom, his teachers "did their best in trying to support him... but there was 24 children in that class. You know, the para, he didn't have his own para. The para also had a very nice relationship with him, but there was 24 other children in that class." Tr. 135.

process was "significantly impeded" such that J.H. was denied a
FAPE.


*d. Alleged Change in IEP Recommendation from 12:1 to 12:1:1*

New York law requires that "the IEP shall list measurable
annual goals, including academic and functional goals, consistent
with the student's needs and abilities." 8 NYCRR §
200.4(d)(2)(iii)(a). Plaintiff alleges that the IEP developed the
goals and needs for a 12:1 program mandate, and then later
changed the mandate to 12:1:1 without updating the goals and
needs. The record establishes that there were not two IEPs, but
rather a single IEP, which was developed over the course of the
CSE review process. The 12:1 program was never formally made part
of the IEP, but was merely discussed among participants and later
rejected. *See* Tr. 22. Because there was no change in the mandate
for J.H.'s classroom structure, there was no requirement to
reconvene the CSE team to discuss other changes in goals and
objectives.


**B. Substantive Adequacy**

I turn to whether the IEP was reasonably calculated to
confer educational benefits. The Second Circuit has described the
standard as follows:

> IDEA does not itself articulate any specific level of
> educational benefits that must be provided through an

IEP. The Supreme Court, however, has specifically rejected the contention that the "'appropriate' education" mandated by IDEA requires states to "maximize the potential of handicapped children." [*Rowley*,] 458 U.S. at 196 n.21, 189. The purpose of the Act was "more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." *Id*. at 192; accord *Lunceford v. District of Columbia Bd. of Educ*., 241 U.S. App. D.C. 1, 745 F.2d 1577, 1583 (D.C. Cir. 1984) (Ruth Bader Ginsburg, J.) (because public "resources are not infinite," federal law "does not secure the best education money can buy; it calls upon government, more modestly, to provide an appropriate education for each [disabled] child"). Plainly, however, the door of public education must be opened for a disabled child in a "meaningful" way. [*Rowley*], 458 U.S. at 192. This is not done if an IEP affords the opportunity for only "trivial advancement." *Mrs. B. v. Milford Bd. of Educ*., 103 F.3d at 1121 (quoting *Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 183 (3d Cir. 1988)). An appropriate public education under IDEA is one that is "likely to produce progress, not regression." *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F*., 118 F.3d 245, 248 (3d Cir. 1997) (internal citation omitted), cert. denied, 139 L. Ed. 2d 636, 118 S. Ct. 690 (1998).

*Walczak*, 142 F.3d at 130.

Plaintiff argues that defendant failed to comply with the substantive requirements of the IDEA because (1) the large size of PS 32 is inappropriate to meet J.H.'s needs, (2) the goals, objectives and behavior intervention plan sections of the IEP fail to address J.H.'s education needs, and (3) the IEP's behavioral intervention plan was incorrectly formulated. For the reasons stated below, I find that only the first argument has merit.

*c. Size of PS 32*

Plaintiff contends that the large size of PS 32 would have been an inappropriate learning environment for J.H. Considering this question on appeal, the SRO noted that Dr. Brandt testified that the 12:1:1 classroom setting was appropriate for J.H., and noted that the CSE considered whether J.H. should be placed in a special school, but rejected that option as being too restrictive, given that J.H. would benefit from interaction with non-disabled peers. The SRO found that the hearing evidence showed that instruction in a large classroom was not appropriate for J.H., but there was no indication that interaction with general education peers in a larger setting would be detrimental. SRO Decision at 13.

In response, plaintiff cites Dr. Brandt's assessment that J.H. required not only a special education classroom, but also a nurturing school environment without undue distractions and transitions. *See* Pl. Ex. D. Plaintiff points to the overall size of PS 32 (250 students), the large number of students sharing the lunch room (75 students), the fact that his reading group would have required him to perform independent reading, and the fact that J.H. would have attended three classes outside of his regular classroom, necessitating transitions that could leave J.H. disoriented and distracted. Plaintiff places particular emphasis on the lack of supervision and structure during lunch

and recess, citing reports that J.H. had difficulty knowing how to interact with other students and that he became easily overwhelmed in unstructured environments.

Defendant correctly points out that, at the public school designated by J.H.'s IEP, J.H. would have received instruction in small classes alongside students with comparable learning difficulties, as well as one-on-one therapy sessions several times a week in a manner appropriate for his needs, and that there is no evidence that this learning environment would not have been appropriate for J.H. However, it is significant that the IEP made no provision to assist J.H. in navigating transitions between classes and interacting with students appropriately in the lunch room and at recess, despite the fact that the IEP heard testimony from Dr. Brandt and J.H.'s teacher at Mary McDowell that J.H. encounters significant obstacles in such environments. Two striking examples include Dr. Brandt's testimony that J.H. became lost as he walked from one end of the classroom to the other during reading time, and Ms. Crafton's testimony that J.H. ate with two utensils and shoveled food into his mouth in a manner disturbing to other children. Without special guidance between classes and at lunch and recess, J.H. may become incapacitated and isolated in a manner that could significantly impact his ability to progress academically.

Defendant maintains that there is no evidence that these

sorts of limitations had a negative effect on J.H.'s academic development. However, given Dr. Brandt's testimony that J.H. requires extensive time to become refocused after a distraction, J.H.'s experiences outside of the classroom are certainly relevant to his academic success. A 20 minute delay in focusing following the lunch and recess period and following each transition to a new classroom would significantly impact J.H.'s classroom experience. These observations do not inherently disqualify PS 32 an inappropriate placement for J.H.; rather, the IEP must take these issues into account and explore whether accommodations could be made to address them. Solutions might include assigning J.H. a monitor to assist him in transitioning between classes and engaging in appropriate interactions at lunch and recess. Because the IEP did not include any provision for J.H.'s needs within school but outside his home room, it was not reasonably calculated to provide him educational benefits.

*b. Goals and Objectives*

An IEP is substantively invalid if it does not include appropriate goals, which must address the child's special education needs. 8 NYCRR 200.4(d)(2)(iii); SRO Decision at 7. Plaintiff claims that the goals in J.H.'s IEP fail to address his deficits and individualized needs, based on the lack of math goals and the fact that many goals are set at the kindergarten

level. The record indicates that J.H. did not have deficiencies
in math that merited the development of math goals. Dr. Brandt
reported no math-related concerns or challenges. The teacher
reports as reflected in the IEP contained numerous concerns
regarding J.H.'s language and writing skills, but no concerns
regarding math. D. Ex. 1 at 4. Given that J.H.'s math skills were
not an area of particular weakness, the SRO correctly found that
there was no requirement to include math goals in the IEP and
there was no denial of FAPE on this ground. Regarding the IEP's
setting of reading goals at the kindergarten level, the SRO
reasonably found that J.H.'s severe delays in this area required
goal setting below his grade level. *See* SRO Decision at 11.

*c. Functional Behavioral Assessment*

The IDEA states that, in the case of a child whose behavior
impedes learning, the IEP should "consider the use of positive
behavioral interventions and supports, and other strategies, to
address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i). Plaintiff
alleges that the IEP's behavior intervention plan was deficient
because it was not supported by a Functional Behavioral
Assessment ("FBA"), which is "the process of determining why the
student engages in behaviors that impede learning and how the
student's behavior relates to the environment." 8 NYCRR §
200.1(r); *see also* 8 NYCRR 200.22(a)(3). However, the IEP's

behavioral intervention recommendations were based on the
thorough report prepared by Dr. Brandt, which detailed J.H.'s
problems with distractability and formulated strategies for
focusing J.H.'s attention.[19] The positive behavioral intervention
services and supports recommended by the IEP were consistent with
the requirements of the IDEA. There is no evidence that the
failure to conduct a functional behavioral assessment resulted in
a denial of a FAPE to J.H. *See A.C.*, 553 F.3d at 172.


C.    **Balance of the Equities**

     Although the IEP contained significant errors, I need not
consider whether plaintiff's unilateral placement of her son at
Mary McDowell was appropriate, because plaintiff has "not
sustained [her] burden of proving that equitable considerations
favor [her] claim." *Carmel Cent. Sch. Dist. v. V.P.*, 373 F. Supp.
2d 402, 417 (S.D.N.Y. 2005). Plaintiff alleges that she
"mentioned" to the CSE team on March 30 that she was
"considering" Mary McDowell. However, she did not tell them that
she had made a non-refundable $5,000 deposit for the following
school year, nor did she alert them that after May 1, she would

---

[19]The behavior intervention plan outlined a goal of having J.H. remain
on task for five minutes at a time. Strategies for achieving this goal were
that rewarding him for good behavior and offering him reminders from teachers
about expectations for performance. D. Ex. 1 at 20. In addition, the IEP
provided for the provision of speech, language, and occupational therapy, a
smaller classroom, and the assistance of a paraprofessional to provide support
for J.H.

be bound to pay the full tuition. *See* Tr. 159. "Certainly a major
consideration in [determining whether the equitable factors
support reimbursement] is whether the parents have cooperated
with the City throughout the process to ensure their child
receive a FAPE." *Bettinger v. N.Y. City Bd. of Educ.*, 2007 U.S.
Dist. LEXIS 86116, *23-24 (S.D.N.Y. November 20, 2007). By the
time DOE made its Final Notice of Recommendation in July of 2007,
plaintiff had already committed to paying Mary McDowell $38,000
for the following year. Plaintiff's claims that she sent letters
to the DOE regarding her placement that went unanswered and that
she visited PS 32 and was given incorrect information regarding
J.H.'s classroom are irrelevant in light of this fact, as it is
clear that she had already decided not to accept the DOE's
recommendation.

If plaintiff had raised her strong concerns and her
intention to enroll at Mary McDowell at the time of the CSE
meeting in late March, defendant would have had an opportunity to
respond to her concerns. Instead, she unilaterally chose to place
J.H. in Mary McDowell before the DOE's process was complete.
"[B]y selecting [the Mary McDowell School] without first
fulfilling [her] obligation to work together with school
officials to find a placement that was appropriate," plaintiff
demonstrated that she did not seriously intend to enroll J.H. in
public school. *See Tucker v. Bay Shore Sch. Dist.*, 873 F.2d 563,

567 (2d Cir. 1989). To permit reimbursement in such a
circumstance would encourage parents to sidestep the process
established by Congress and New York law to ensure that disabled
children receive a free appropriate public education.[20]


## III. Declaratory Judgment

Plaintiff additionally seeks a declaratory judgment that
defendant violated the IDEA by developing an inadequate IEP.

In order to decide whether to entertain an action for
declaratory judgment, a court must ask: "(1) whether the judgment
will serve a useful purpose in clarifying or settling the legal
issues involved; and (2) whether a judgment would finalize the
controversy and offer relief from uncertainty." *Duane Reade, Inc.
v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir.
2005) (citing *Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d
998, 1001 (2d Cir. 1969)). "If either prong is met, the action

---

[20]In addition, although plaintiff allegedly sent letters to Mr. Larry
Parker in the summer of 2007 alerting him to her concerns about J.H.'s
placement, she failed to object to the IEP in the manner dictated by the Final
Notice of Recommendation, which provided the name and contact information of
D.A. Mimms, whom plaintiff could contact if she wished to contest J.H.'s
placement. "Courts have held uniformly that reimbursement is barred where
parents unilaterally arrange for private educational services without ever
notifying the school board of their dissatisfaction with their child's IEP."
*M.C.*, 226 F.3d at 68 (citing cases); *see also Bernardsville Bd. of Educ. v.
J.H.*, 42 F.3d 149, 158 (3d Cir. 1994) ("As a practical reality, and as a
matter of procedural law..., the right of review contains a corresponding
parental duty to unequivocally place in issue the appropriateness of an
IEP."). Plaintiff's notification of a person not listed on the form did not
suffice to provide notice to the Department of Education that she was
contesting her placement. Plaintiff asserts that Larry Parker was listed on
the form as an additional contact person. However, the form provided in the
record contains no reference to Mr. Parker. *See* D. Ex. 6.

must be entertained." *Continental Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 737 (2d Cir. 1992).

Although the challenged IEP was created for the 2007-2008 school year, which has passed, IEPs for disabled students are created annually, and must describe the specially designed instruction and services that will enable the child to meet educational objectives. *Id.* 20 U.S.C. § 1414(d)(1). Errors in one IEP may be repeated in subsequent IEPs, as is evidenced by the fact that J.H. spent two years in a CTT kindergarten classroom that was not properly tailored to his disabilities. Accordingly, a declaratory judgment that the 2007-2008 IEP developed for J.H. was procedurally and substantively deficient is useful in "clarifying or settling" the adequacy of any subsequent IEPs developed for J.H. pursuant to the IDEA. *See Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 94 (2d Cir. 2005) (where hearing officer erred in ruling that she lacked jurisdiction to consider child's safety concerns in connection with a proposed IEP, but the challenged IEP was never implemented, and therefore it would be futile to remand for correction of that particular plan, the Court directed the district court on remand to grant declaratory judgment in favor of plaintiff "to ensure that defendants understand that safety concerns may be considered in development and review of future IEPs."). Plaintiff is granted a declaratory judgment to the

following effect: the IEP was deficient in that a special education teacher of J.H. was lacking from the CSA team and the IEP failed to make accommodations for J.H. that addressed the distractions he faced in school but outside the classroom.

### CONCLUSION

For the reasons stated herein, plaintiff's petition to overturn the SRO decision and receive reimbursement for tuition paid during the 2007-2008 school year to privately educate her child is denied. Plaintiff is granted a declaratory judgment that defendant failed to comply with the requirements of the IDEA as more fully described herein. The Clerk is directed to transmit a copy of the within to all parties and the assigned Magistrate Judge.

SO ORDERED.


Dated:      Brooklyn, New York
            August 20, 2009

                          By: /s/ Charles P. Sifton (electronically signed)
                                United States District Judge